| | | |
|---|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE | * | IN THE |
| City Hall 100 North Holliday Street Baltimore, Maryland 21202 | * | CIRCUIT COURT |
| c/o Venable LLP | * | FOR BALTIMORE |
| 750 E. Pratt Street, Suite 900 Baltimore, Maryland 21202 | * | CITY |
| | * | |
| Plaintiff | * | CASE NO.: _____ |
| v. | * | |
| | * | |
| SPARROWS POINT LLC | * | |
| National Registered Agents, Inc. of Md. 351 W. Camden Street | * | |
| Baltimore, Maryland 21201 | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

The Plaintiff, the Mayor and City Council of Baltimore (the "Plaintiff" or the "City"), through its undersigned counsel, for its Complaint against the Defendant Sparrows Point LLC (the "Defendant"), respectfully states, claims and alleges as follows:

## PARTIES AND JURISDICTION

1.     The Plaintiff is the Mayor and City Council of Baltimore, with an address of City Hall, 100 North Holliday Street, Baltimore, Maryland 21202.

2.     The Defendant is Sparrows Point LLC, a Missouri limited liability company, with its principal place of business at 1650 Des Peres Road, St. Louis, Missouri 63131 and a Maryland resident agent address of National Registered Agents, Inc. of Md., 351 W. Camden Street, Baltimore, Maryland 21201.

3.      This Court has subject-matter jurisdiction over this matter pursuant to § 1-501 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code.

4.      This Court has personal jurisdiction over Sparrows Point LLC pursuant to § 6-103 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code.

5.      Venue is proper in this Court pursuant to §§ 6-201 and 202 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code.

## INTRODUCTION

6.      This case arises from the Defendant's attempt to hold hostage the City and its and Baltimore County's inhabitants' ability to flush their toilets, just so that Defendant may pursue its extortionate demands for more money while providing fewer services.  Rather than accept the reality that its agreement with the City has been renewed – an agreement whereby the Defendant accepts up to 40 million gallons per day of the treated effluent from the Back River Waste Water Treatment Plant in return for $80,000 per month – the Defendant claims that it has terminated the agreement.

7.      The Defendant makes this baseless claim in order to force the City to accept Defendant's extortionate demand, or harm the environment through a permit-violating discharge of pollutants.

## FACTUAL BACKGROUND

8.      The City owns and operates the Back River Wastewater Treatment Plant, a wastewater treatment plant located in Baltimore County, Maryland at 8201 Eastern Avenue, Baltimore, Maryland  21224 (the "Treatment Plant") which serves Baltimore City and Baltimore County.

9.      The Defendant is the fee simple owner of certain real property located in

Baltimore County commonly known as Sparrows Point (the "Steel Facility").

10.     Twenty-four hours per day, year round, the Treatment Plant accepts wastewater from approximately 1.3 million residents and businesses in a 140 square mile area of Baltimore City and County, treats the wastewater and then discharges the treated wastewater (effluent) pursuant to Back River Wastewater Treatment Plant National Pollutant Discharge Elimination System Permit No. MD0021555 and 10-DP-0581 (the "Back River NPDES Permit") (*see* attached Exhibit A).

11.     The Back River NPDES Permit has two approved discharge points: Outfall 001, discharging the majority of effluent from the Treatment Plant to the Back River, a water of the State; and Outfall 002, discharging effluent into two 5-mile pipelines (the "Pipes") owned by the Defendant.

12.     Since at least the 1940s, effluent from the City's Treatment Plant had been sent through the Pipes to the Steel Facility to be used as industrial water as part of the steel making process.

13.     Steel production ceased at the Steel Facility just prior to the Defendant's September 14, 2012 purchase of the Steel Facility and the Defendant has not needed the City's effluent for steel processing since its purchase of the Steel Facility.

14.     The City cannot use solely Outfall 001 due to load restrictions in the Back River NPDES Permit that limit certain pollutants that can be discharged through Outfall 001. Therefore, the City also discharges effluent to Outfall 002, which allows it to remain in compliance with the Back River NPDES Permit.

15.     Because of the City's need to discharge effluent from the Treatment Plant through Outfall 002, the City and the Defendant entered into an Interim Agreement (the "Interim

Agreement") effective September 14, 2012 allowing the City to continue to discharge up to 40 million gallons per day ("mgd") of effluent through Outfall 002 through the Pipes and Steel Facility until its eventual discharge into the Chesapeake Bay and/or adjacent water bodies through one of the Defendant's State-approved outfalls.  A copy of the Interim Agreement is attached hereto as Exhibit B.

16.     The Interim Agreement covered the period from September 14, 2012 through September 13, 2013, with an option for multiple additional one year renewals.

17.     On July 9, 2013, the Defendant sent the City a letter purporting to terminate the Interim Agreement (the "July 9 Letter").  The July 9 Letter did not mention any defaults under the Interim Agreement nor did the City receive any default letters from the Defendant prior to July 9, 2013.

18.     The City responded by letter dated July 30, 2013 stating that because it was not in breach of its obligations under the Interim Agreement, pursuant to Section 8 of the Interim Agreement, the Agreement could not be terminated by the Defendant.

19.     The Defendant responded by letter dated August 15, 2013 (the "August 15 Letter") stating that the City's payments pursuant to the Interim Agreement had been untimely, that three payments had not been made to date (June, August and September) and that, therefore, a payment default existed. The Defendant followed the August 15 Letter with a letter dated August 16, 2013 providing that the Discharge Monthly Reports (DMRs) provided by the City pursuant to the Interim Agreement failed to include data required by the Interim Agreement. While both of these alleged defaults should have existed on July 9, 2013, neither was mentioned in the July 9 Letter.

20.     The City responded by letter dated August 21, 2013 (the "August 21 Letter") stating that in accordance with the practice of both parties since the inception of the Interim Agreement, payments have been consistently made by the City in arrears at the end of the month after being invoiced by the Defendant and that there was no payment default because the City had not yet received an invoice for June and the August and September payments were not yet due. For example, payment for August was due on or after September 1, 2013.  The August 21 Letter further stated that all testing required by the Interim Agreement had been completed and that the City would provide any additional reports required.

21.     While the City maintained that it was not in default and reserved all of its rights, and the Defendant maintained that the City was in default and reserved all of its rights, the City and the Defendant agreed that that the City would send $160,000 for the June and August payments and the Defendant would withdraw its termination notice.

22.     On August 26, 2013, the City wired the Defendant $160,000 for the June and August 2013 payments.

23.     On August 27, 2013, the Defendant withdrew its alleged termination of the Interim Agreement without prejudice.

24.     On September 5, 2013, the City wired the Defendant $34,666.67 for the period September 1 through September 13, 2013.

25.     On September 5, the City also provided the sampling data required by the Interim Agreement.

26.     On September 6, 2013, the Defendant sent the City proposed terms and conditions for reinstating and amending the Interim License Agreement.

27.     On September 11, 2013, the City replied to the Defendant's September 6 proposal with a counter-proposal for a long term solution.

28.     On September 11, 2013, the Defendant reiterated its arbitrary demands, rather than respond to the City's counter-proposal.  Among other things, the September 11 proposal purported to reinstate the Defendant's termination notice of the Interim Agreement.  Further, it provided that unless the City accepted the Defendant's proposed terms and conditions without modification or condition, there would be a disruption of service under the Interim Agreement. One such non-negotiable condition was that the amount of effluent received by the Defendant be reduced by more than 50% from 40 mgd to 18 mgd while the $80,000 monthly payment remained constant.

29.     On September 12, 2013, the City wired the Defendant $45,333.33 for the period September 14 through September 30, 2013 to allow effluent to continue to be sent to Sparrows Point while discussions between the parties took place.

30.     On September 18, 2013, the Defendant wrote that it would continue to accept 40 mgd until September 30, 2013 at which point it would only accept 18 mgd of effluent as long as the City agreed to pay $80,000 per month while a long-term solution was negotiated.  The Defendant provided that it would accept $150,000 per month in exchange for accepting 40 mgd while a long-term solution was negotiated.  Absent acceptance of one of these two extortionate pre-negotiation demands, the Defendant was unwilling to engage in any negotiations with the City.

31.     On September 19, 2013, the City responded to the September 18 Letter to say that the Interim Agreement had been extended by one year by its own terms and that it would not

agree to new quantity and price terms prior to and as a condition of beginning negotiations.  The City restated and emphasized its willingness to immediately begin good faith negotiations.

32.    On September 24, 2013, the City wired the Defendant $80,000 for October under the Interim Agreement.

33.    On September 27, 2013, the Defendant rejected the City's September 24 payment.

34.    Also on September 27, 2013, the Defendant informed the City by e-mail that, absent acceptance of its unilateral pre-negotiation price and volume terms, it would begin the shutdown process to prevent the flow of effluent from the Treatment Plant to the Steel Facility on Thursday, October 3, 2013 at 8:00 a.m.

35.    Among other things, the Interim Agreement provides that the Defendant can only terminate the Interim Agreement if such termination will not result in the City violating the Back River NPDES Permit, provided that the City is not in default under the Interim Agreement.

36.    The City is not in default under the Interim Agreement.

37.    The Baltimore City Board of Estimates approved the renewal of the Interim Agreement on August 27, 2013.  The City has continued to pay $80,000 per month as required by the Agreement, but the City's last payment was rejected and returned by the Defendant.

38.    The Defendant's alleged termination under the Interim Agreement does not constitute a valid termination under the Interim Agreement.

39.    Because there was no valid termination of the Interim Agreement, the Interim Agreement automatically renewed pursuant to Section 8 therein, which provides that the Interim Agreement will automatically renew if it has not been terminated.

40.    The Interim Agreement constitutes a valid, binding and enforceable contract.

41.    At all times relevant hereto, the City was and remains ready, willing, and able to

perform under the terms of the Interim Agreement.

42.     The City has no adequate remedy at law.

43.     The Defendant has informed the City that beginning tomorrow, October 3, 2013, in violation of the Interim Agreement and at significant risk of contamination to Back River and the surrounding environment, it will refuse to accept any effluent from the Treatment Plant.

44.     If the Defendant refuses to accept any effluent, the Treatment Plant will have no other option but to discharge all of its effluent through Outfall 001, which will likely result in a violation of the load restrictions and notice provision in the Back River NPDES Permit.

45.     The violation of state and federal environmental standards constitutes a public nuisance.

46.     The Defendant's unlawful termination of the renewed Interim Agreement will force the City to violate the discharge limits in its Back River NPDES Permit, thereby causing a public nuisance.

## COUNT I
### (Specific Performance)

47.     The City adopts and incorporates by reference the allegations of Paragraphs 1 through 46 of the Complaint as if fully set forth herein.

48.     The City has demanded that the Defendant continue to accept effluent under the terms of the Interim Agreement as automatically renewed.

49.     The Defendant has stated that it will refuse to do so, starting tomorrow, October 3, 2013.

50.     Defendant's failure to accept effluent is a breach of the renewed Interim Agreement.

51.     The Plaintiff is entitled to specific performance of the terms, conditions, and provisions of the Interim Agreement, by court order, among things, directing the Defendant to continue to accept effluent pursuant to the Interim Agreement.

WHEREFORE, the Plaintiff respectfully requests that this Court:

a.     Enter an Order requiring the Defendant comply with the Interim Agreement and accept the Plaintiff's treated effluent under the Interim Agreement.

b.     Grant any other and further relief deemed appropriate by this Court.

## COUNT II
### (Public Nuisance)

52.     The Plaintiff adopts and incorporates by reference the allegations of Paragraphs 1 through 51 of the Complaint as if fully set forth herein.

53.     At all relevant times to this action, the Defendant's intended actions and/or omissions with respect to effluent discharged from the Treatment Plant through Outfall 002 will cause, maintain, and/or contribute to the substantial and unreasonable contamination and/or threatened contamination of the Back River, a water of the State, constituting a public nuisance.

54.     The Defendant's operation of Sparrows Point LLC, including its refusal to accept up to 40 mgd of treated effluent from the Treatment Plant, substantially and unreasonably interferes with, and/or threatens, the public's right to use and enjoy the public natural resources and waters of the State in the surrounding area free from unacceptable and unreasonable public health, safety, comfort, and convenience risks.

55.     The Defendant knew or should have known that refusing to accept Plaintiff's treated effluent would result in a breach or violation of the City's Back River NPDES Permit.

56.     The public nuisance caused and/or contributed to by the Defendant continues to threaten and/or contaminate the public resources and waters of the State.

57.     The public nuisance caused and/or contributed to by the Defendant may expose the City to significant civil liabilities, including penalties for violations of its Back River NPDES Permit.

58.     The public nuisance caused by Defendant may expose the City to possible citizen suits for violations of the effluent limitations in its Back River NPDES Permit.

[remainder of page intentionally blank]

WHEREFORE, the Plaintiff respectfully request that this Court:

a.    Enter a preliminary injunction ordering the Defendant to abate the alleged

nuisance by continuing to accept the Plaintiff's treated effluent under the Interim

Agreement as automatically renewed.

b.    Grant any other and further relief deemed appropriate by this Court.

Respectfully submitted,

George A. Nilson
City Solicitor
City of Baltimore
City Hall
100 N. Holliday Street
Baltimore, Maryland  21202
(410) 396-3297

Michael Schatzow
Thomas M. Lingan
Andrew J. Currie
Venable LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland  21202
(410) 244-7400

*Counsel for the Mayor and City Council of
Baltimore City*